## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ENVIRONMENTAL REMEDIATION AND
FINANCIAL SERVICES, LLC,,

    Plaintiff,

    v.

ENVIROANALYTICS GROUP, LLC,
JANESVILLE DREDGING COMPANY, LLC,
MICHAEL WARNER, DAVID WILDER,
JOHN DOES 1-20 AND XYZ CORPS. 1-20,,

    Defendants.

Civil Action No.

### <u>NOTICE OF REMOVAL</u>

Defendant, EnviroAnalytics Group, LLC, by and through its undersigned counsel, Brach

Eichler LLC, hereby files this Notice of Removal pursuant to 28 U.S.C. §§ 1441 and 1446, and

in support thereof, avers as follows:

1.    EnviroAnalytics Group, LLC ("EAG"), is a Defendant in a civil action filed by

Plaintiff, Environmental Remediation and Financial Services, LLC ("Plaintiff") on or about

February 5, 2019, in the Superior Court of New Jersey, Law Division, Hudson County, Docket

No.: HUD-L-000540-19 (the "Action").

2.    EAG was served with the Summons and Complaint on or about February 12, 2019.

A copy of the Summons, Complaint and Civil Case Information Statement, which constitute all

process and pleadings served upon EAG in the Action, and of which EAG has notice, are attached

as Exhibit A.

3.    Pursuant to 28 U.S.C. §§ 1441 and 1446, EAG seeks to remove the Action to the

United States District Court for the District of New Jersey, which is the federal judicial district in

which the Action is pending.

4.     The Action is one over which this Court has original jurisdiction based upon federal question jurisdiction under 28 U.S.C. § 1331.

5.     Specifically, Plaintiff asserts a claim in Count Four of the Complaint under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. *See Exhibit A ¶¶ 107-113.*

6.     In addition, the Action is one over which this Court has original jurisdiction based upon diversity of citizenship under the provisions of 28 U.S.C. § 1332.

7.     As alleged in the Complaint, Plaintiff is a New Jersey limited liability company with its principal place of business in New Jersey. *See Exhibit A ¶ 1.*

8.     As alleged in the Complaint, EAG is a Missouri limited liability company with its principal place of business in Missouri. *See Exhibit A ¶ 2.*

9.     As alleged in the Complaint, Defendant Janesville Dredging Company, LLC ("JDC") is a Wisconsin limited liability company with its principal place of business in Wisconsin. *See Exhibit A ¶ 3.*

10.    As alleged in the Complaint, Defendant Michael Warner ("Warner") is an individual who resides in Wisconsin. *See Exhibit A ¶ 4.*

11.    As alleged in the Complaint, Defendant David Wilder ("Wilder") is an individual who resides in North Carolina. *See Exhibit A ¶ 5.*

12.    The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

13.    The requirements for diversity of citizenship set forth in 28 U.S.C. § 1332(a)(1) are satisfied because the amount of controversy exceeds $75,000.00, exclusive of interest and costs, and the Action is between citizens of different states.

14.    EAG is filing this Notice of Removal within thirty (30) days of receipt of the Complaint, by service or otherwise, as required by 28 U.S.C. § 1446(b).

15.  A copy of this Notice of Removal is being served on Plaintiff's attorney of record, William Matsikoudis, Esq. of the law firm Matsikoudis & Fanciullo, LLC, located at 128 Monticello Ave, Str. 1, Jersey City, NJ 07304, and is being filed with the Clerk of the Superior Court of New Jersey, Law Division, Hudson County, as required by 28 U.S.C. § 1446(d).

16.  Pursuant to U.S.C. § 1446(b)(2)(A), JDC, Warner and Wilder have consented to this application in writing, as set forth on Exhibit B.

Respectfully submitted,

/s/ Thomas Kamvosoulis, Esq.
Charles X. Gormally, Esq.
Thomas Kamvosoulis, Esq.
BRACH EICHLER LLC
101 Eisenhower Parkway
Roseland, New Jersey 07068
tkamvosoulis@bracheichler.com
Telephone: 973-228-5700
Facsimile: 973-228-7852

Defendant, EnviroAnalytics Group, LLC

Dated: March 12, 2019

# EXHIBIT A

**MATSIKOUDIS & FANCIULLO, LLC**
William C. Matsikoudis, Esq.
NJ Attorney No.:
Derek S. Fanciullo, Esq.
NJ Attorney No: 04468-2011
128 Monticello Avenue, STR 1
Jersey City, New Jersey 07304
(t) (201) 915-0407
(f) (201) 536-2026
*Attorneys for Plaintiff*
*Environmental Remediation and Financial Services*

| | |
|---|---|
| ENVIRONMENTAL REMEDATION AND FINANCIAL SERVICES, LLC<br><br>Plaintiff,<br><br>v.<br><br>ENVIROANALYTICS GROUP, LLC, JANESVILLE DREDGING COMPANY, LLC, MICHAEL WARNER, DAVID WILDER, JOHN DOES 1-20 AND XYZ CORPS. 1-20,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY, LAW DIVISION, HUDSON COUNTY<br><br>DOCKET NO.:<br><br><u>CIVIL ACTION</u><br><br><u>COMPLAINT</u> |

Plaintiff Environmental Remediation and Financial Services, LLC ("ERFS" or

"Plaintiff") hereby complains and alleges as follows:

<u>**PARTIES AND JURISDICTION**</u>

1.  ERFS is a New Jersey limited liability company, with its headquarters and primary

place of business in New Jersey.  Additionally, ERFS' lone member resides in New

Jersey. Of instant relevance, ERFS is a multi-dimensional environmental remediation

firm, which specializes in cleaning up the "worst of the worst."

2.  Upon information and belief, Defendant EnvironAnalytics Group, LLC ("EAG") is a

Missouri limited liability company, with its headquarters and primary place of

1

business in Missouri. Notably, EAG was a long-standing ERFS customer – and would have been an ERFS customer with respect to the environmental clean-up at the heart of this matter, until EAG conspired and teamed with the other Defendants to steal ERFS equipment and surreptitiously cheat ERFS out of a significant business opportunity.

3. Upon information and belief, Janesville Dredging Company, LLC ("JDC") is a Wisconsin limited liability company, with its headquarters and primary place of business in Wisconsin.

4. Defendant Michael Warner ("Mick" or "Warner") is an individual, and, upon information and belief, a resident of Wisconsin. Additionally, upon information and belief, Warner is the sole member of JDC – a company he formed on or about June 28, 2018, while acting as an agent for and directly working on behalf of ERFS.

5. Defendant David Wilder ("Dave" or "Wilder," and, together with EAG, JDC and Warner, the "Defendants," and, each, a "Defendant") is an individual, and, upon information and belief, a resident of North Carolina.

6. Plaintiff is unaware of the true names or capacities of Defendant Does 1 through 10, and therefore sues them by such fictitious names, and will seek leave of this Court to insert true names and capacities once they are ascertained.

7. Plaintiff is unaware of the true names or capacities of Defendant ABC Corporations 1 through 20, and therefore sues them by such fictitious names, and will seek leave of this Court to insert true names and capacities once they are ascertained.

8. At all times mentioned herein, Defendants, and each of them, inclusive of Does 1 through 20 and XYZ Corps. 1 through 20, were authorized and empowered by each

2

other to act, and did so act as agents of each other, and all of the claims herein alleged to have been done by there were thus done in capacity of such agency.   Upon information and belief, all Defendants are responsible in some manner for the events described herein, and are liable to Plaintiff for the damages Plaintiff has incurred.

9.  As Plaintiff is a New Jersey limited liability entity, whose sole member is a New Jersey resident; as Plaintiff conducts substantial business in Hudson County; as Mick and Dave, by virtue of certain contractual agreements with ERFS, have expressly subjected themselves to the jurisdiction of the courts of the State of New Jersey; and EAG does routine business in New Jersey; as Defendants committed various tortious acts, including certain intentional tortious acts, in New Jersey, and, more specifically, in Hudson County, as Plaintiff will describe same *infra*; as various of the incidents described herein thus occurred in Hudson County and the State of New Jersey; and as Plaintiff's Complaint sounds entirely in New Jersey state law, this Court is the proper forum for trial in this action.

## FACTS COMMON TO ALL COUNTS

10. Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

### The BioPath Backdrop

11. In or about August 2016, Mick, who had just divorced from BioPath, came to ERFS in desperate need.  Mick had effectively rekindled a relationship with ERFS a few months before – by linking ERFS and BioPath together in a short-lived teaming agreement.  Now, Mick came to ERFS with a plea for help – and a purported opportunity.

3

12. Mick was a BioPath executive and, even though he was no longer technically an environmental engineer (as he had let his licenses lapse), an environmental remediation specialist. As BioPath struggled to make ends meet (and allegedly crumbled around him), Mick called in a favor to a friend – the managing partner of a company that purchases environmentally contaminated properties, remediates them and sells them for a profit. Mick secured from his friend's company a multi-million-dollar contract to remediate a contaminated former power plant site (the "Power Plant Contract").

13. However, in the midst of its performance on the aforesaid contract, BioPath effectively went under, declaring for bankruptcy over the Summer of 2016. BioPath was thus unable to complete the Power Plant Contract for Mick's friend's company.

14. Mick's friend was upset: He had stuck his neck out with *his* partners to give Mick the Power Plant Contract, and Mick flopped. This was a problem for Mick, as, beyond potentially losing a personal connection, his friend had promised Mick that, once Mick and BioPath completed this first contract, he would be able to funnel to Mick tens of millions of dollars in remediation work on other sites his company owned or was in the process of buying.

15. Additionally, Mick told ERFS that he and Dave, a longtime associate and fellow former BioPath executive, had not been paid for weeks or months, and were in significant personal financial trouble.

16. Mick explained all of the aforesaid to ERFS, and further told ERFS that, were ERFS to bring on Mick and Dave, Mick would be able to bring the Power Plant Contract to ERFS. As Mick explained to ERFS, the contract with his friend's company was nearly

4

complete, ERFS would be able to finish work on it in (at most) a couple of months, and, once it did, it would be in line to realize both a significant profit from its work on the unfinished contract *and* the tens of millions of dollars of other business with Mick's friend's company.

17. In his pitch to ERFS, Mick also blamed BioPath's "other" principals for its downfall. Mick explained that, outside of he and Dave, none of BioPath's other managers had any experience with environmental remediation, and they thus made cripplingly bad decisions and began to fight internally. Per Mick, these "other" BioPath principals split into two factions, began to sue one another in multiple legal forums, and brought down the company as a result. ERFS did due diligence on Mick's claims, poring through BioPath's bankruptcy records, and Mick's story appeared to check out: The bankruptcy records showed that BioPath's management team had splintered into two factions, and the company's infighting had infuriated various judges from New York to Delaware to the United States Bankruptcy Court.

18. Given this, and moved by Mick's plea for help and the opportunity to work in both the short-term and long-term with Mick's friend's company, ERFS brought Mick and Dave aboard, gave both lucrative executive contracts, and formed a division – Environmental Land Services ("ELS") – that the two would manage.  Both Mick's and Dave's ERFS contracts included express noncompete clauses, which forbade Mick and Dave from, *inter alia*, owning, managing, being employed by or rendering services to any entity that provided environmental remediation services or in any way competed with ERFS. In addition, Mick and Dave's ERFS contracts precluded Mick and Dave from soliciting or accepting any business from any ERFS customer and/or inducing

5

any ERFS customer to do business with any entity in competition with ERFS. Mick and Dave's contracts are annexed hereto as **EXBHIT A (Mick's Contract) and EXHIBIT B (Dave's Contract)**.

<u>The Trouble With Mick and Dave Starts Almost Immediately</u>

19. ERFS also reached a deal with Mick's friend's company, to ostensibly assume the Power Plant Contract and the responsibility for the clean-up BioPath failed to finish.

20. As stated above, under Mick and Dave's guidance, the Power Plant Contract clean-up was only supposed to take a couple months to finish. Needless to say, it did not. Indeed, because of Mick and Dave's mismanagement of the project, the site *still* is not fully remediated (and, as will be explained below, ERFS had to cease performance on and retire the Power Plant Contract).

21. ERFS's problems with Mick and Dave started only a few *days* after ERFS signed them on as executives.

22. Approximately one week after ERFS executed its Power Plant Contract, a vendor who supplied equipment to BioPath for the project came knocking on ERFS's door. Based on Mick and Dave's representations that only a "couple" of unpaid BioPath vendors existed, and, more importantly, in aggregate, unpaid BioPath vendors were owed a "maximum of $30,000," ERFS had assumed responsibility in its Power Plant Contract to pay off any unpaid BioPath vendors out of the contract's proceeds. However, the *first vendor* to come to ERFS seeking money (for BioPath's unpaid bills) was owed $45,000.

23. Several more BioPath vendors/creditors followed, looking for money. Ultimately, ERFS had to pay several hundred thousand dollars to unpaid BioPath

6

vendors/creditors – far more than Mick and Dave had promised.  This profoundly impacted ERFS – as it meant ELS, Mick and Dave's division, almost immediately found itself "in the red."  ERFS's payments to unpaid BioPath vendors effectively ate away any profits ERFS may have realized on the Power Plant Contract.

24. Nonetheless, ERFS tried to put a positive spin on the fact it would not profit from the Power Plant Contract. ERFS figured it would promptly finish the Power Plant Contract at cost, prove its chops to Mick's friend and his company, then see its profits in the "tens of millions of dollars" of business down the road.

25. However, Mick and Dave's mismanagement of the Power Plant Contract clean-up wrecked those plans. Simply, Mick and Dave blew through their budget – and then some. For instance, Mick and Dave purchased or leased a significant amount (of frequently expensive heavy) equipment without ERFS approval. Moreover, Mick and Dave's failure to timely complete the project meant ERFS had to pay an army of workers and dozens of other costs much longer than it had contemplated.

26. In sum, far from profiting ERFS, or even allowing ERFS to "break even," Mick and Dave's disastrous mishandling of the Power Plant Contract *lost* ERFS hundreds of thousands of dollars.

27. Nonetheless, Mick and Dave were adamant that everything would be fine, as ERFS needed only to look to the very near future to see millions of dollars of profit: Per Mick and Dave, Mick's friend's company was close to acquiring a new contaminated property (the "Southern Ohio Property") – which would mean *more than $40 Million* in highly-profitable remediation work for ERFS.

28. Unable to cover all of ELS's (i.e., Mick and Dave's) losses via profits from its various other divisions, and as Mick and Dave had generated absolutely no "new" business leads, ERFS was essentially forced to put any hopes it had of restoring ELS to a "break even" point (let alone, profitability) in the Southern Ohio Property.

29. Alas, Mick and Dave's (and consequently, ERFS's) failure to timely complete the Power Plant Contract remediation gave Mick's friend and his company cold feet about working with ERFS.

30. Months later, after everything fell apart, Mick and Dave would "come clean" that Mick's friend had developed and voiced to them concerns about their handling of the Power Plant Contract. However, as the Power Plant Contract project plodded along and hemorrhaged money, and it became clear ERFS would have to rely on the Southern Ohio Property to "get well," Mick and Dave effectively defrauded ERFS. For months, they steadfastly asserted that ERFS was in line for multiple contracts at the Southern Ohio Property *and* other contracts related to the Power Plant Contract, which would mean the imminent infusion of millions of dollars into ERFS's coffers. Indeed, these contracts would come loaded with "up-front" or payments for mobilization, which would be more than enough to make ERFS whole. The only issue, per Mick and Dave, was that Mick's friend's company needed to delay closing on the Southern Ohio Property for regulatory and logistical reasons – but, any such problems would ultimately be resolved.

31. As Mick and Dave were ERFS's sole points of contact with Mick's friend, and as Mick and Dave were *assigned* by ERFS to collect information from and liaise with Mick's

friend, ERFS could only presume that Mick and Dave were conveying truthful information. They were not.

32. In late February 2018, however, the lies Mick and Dave had constructed came crashing down. Mick's friend's company finally closed on and formally purchased the Southern Ohio Property. Two days later, in a letter from Mick's friend, Mick's friend company terminated ERFS's involvement in the Power Plant Contract -- and its relationship with ERFS. There would be no $40 Million in additional business. Indeed, there would be *nothing* more for ERFS.

### The Post Power-Plant Contract Scramble

33. Ultimately, ERFS's losses on the Power Plant Contract were so significant, they threatened ERFS's viability. For a company that had been in business for two decades with perfect credit, a impeccable reputation in the industry, and not a single blip on its resume or ledger, this was shocking.

34. However, when Mick's friend terminated his company's relationship with ERFS, ERFS still had to pay various vendors several hundred thousand dollars (for invoices Mick and Dave had run up) related to the Power Plant Contract. As intimated above, ERFS planned to pay these vendors out of up-front monies it would make on contracts related to the Southern Ohio Property.

35. As such, ERFS was forced to scramble to try and salvage both ELS and its own operations.

36. Multiple times each week, from March through May, ERFS's CEO engaged in conference calls with Mick and Dave, pushing them to both come up with a. business plan for ELS (their division) and find new customers for ELS's services.

9

37. In their initial pitch to ERFS, Mick and Dave had promised that they had multiple customers (i.e., customers beyond Mick's friend's company) lined up to do business with ELS and ERFS. However, across two months, when their division was in such dire straits it had nearly sunk ERFS, the only "idea" they put forward: ERFS should circle back to Mick's friend's company to make *sure* he really did not want to work with ERFS any more.

38. Thankfully, during this time, ERFS, it officers and employees in its *other* divisions also tried to find ELS work.

39. Those "other" efforts bore fruit. In May 2018, ERFS's Executive Vice President of Remediation (the "Remediation VP") leveraged a long-time contact at Defendant EAG, and essentially secured with EAG a multi-million-dollar remediation contract for ELS and ERFS (the "Janesville Contract"). As ERFS had calculated it, the Janesville Contract would have not only fully restored ELS to a "break-even" point and allow ERFS to pay off all the Power Plant Contract vendors, it might have even put ELS "in the black."

40. The contract the Remediation VP had essentially procured involved dredging the Rock River (the "River") in Janesville, Wisconsin to remove certain solid contaminants – *exactly* the kind of work ELS was set up to do.

41. As ERFS had done extensive work for and with EAG through the years, and the companies appeared to have a solid working relationship, ERFS's CEO and its Remediation VP conducted most of ERFS's negotiations with ELS. Talks became so advanced, ERFS added EAG (and another subsidiary company) as insureds on its various insurance policies (at EAG's request), and transmitted to EAG a W-9 and tax

information, so that, per EAG's Director of Remediation, EAG could "issue a PO [purchase order]" to hire and pay ERFS.

42. This said, before a deal could be reached, ERFS and EAG needed to come to an agreement on material details like project scheduling, project milestones, and when payments would issue. Additionally, EAG had to meet with the Wisconsin Department of Natural Resources (the "WIDNR") to gain approval for its (and, by extension, ERFS's) remedial approach to the River.

43. ERFS thus turned to Mick. Not only was Mick a head of ELS – the division that would handle this remediation for ERFS (meaning he was the best person to devise project schedules, milestones and the like), but, serendipitously, *Mick grew up in Janesville and still lived in Wisconsin*. He knew the area, what it would take to remediate the River and, very likely, people inside the WIDNR who could help facilitate securing the agency's approval.

44. On or about May 15, 2018, Mick was thus expressly tasked with finalizing ERFS's deal with EAG.

45. But, not long after Mick received these marching orders, he went disturbingly silent. He stopped checking in with ERFS. He stopped answering phones and returning calls. He stopped emailing, texting or sending communiques of any kind.

46. In short, the man charged with putting the finishing touches on a critical contract that ERFS had essentially gift-wrapped for him dropped off ERFS's radar.

<u>Mick and EAG Conspire to Work Together –</u>
<u>and Allow Mick to Steal ERFS's EAG Contract</u>

47. Just as disturbingly, around the same time Mick went radio-silent, so did EAG.

11

48. The disappearances of Mick and EAG hardly seemed coincidental, and they sent ERFS into a panic: Its officers and attorneys began reaching out continually to Mick and EAG – but got no response to numerous calls and emails.

49. Finally, Mick surfaced – albeit, apparently accidentally. On or about June 19, 2018, ERFS was copied on an email Mick sent to recipients (including EAG) from the address "mwarner@janesvilledredging.com." In other words, for reasons passing understanding, as he attempted to bring home the EAG contract, Mick was not using his ERFS email address to communicate with the client (or anyone else, for that matter).

50. ERFS investigated – and determined that Mick had registered the domain name and address "janesvilledredging.com" on or about June 1, 2018.

51. ERFS's counsel thus prepared cease and desist letters for Mick and Dave – and, before they sent them, reached out to Mick one last time to demand an update and an explanation (for, among other things, "jansevilledredging.com").

52. Surprisingly, Mick responded – and confirmed ERFS's worst fears: He admitted to ERFS's counsel that he had stolen the EAG contract for himself and a new environmental remediation company he had created. As stated above, upon information and belief, Mick created JDC on or about June 28, 2018.

53. Rather than finalize a contract with EAG for ERFS, Mick conspired with EAG to misappropriate ERFS's confidential information, including, *inter alia*, ERFS's plans, approaches and financial projections regarding the Janesville Contract project.

<u>Mick, Dave and EAG Conspire to Steal – and, In Fact, Steal –
Several Hundred Thousand Dollars of ERFS's Equipment</u>

54. Of course, Mick and EAG could not pull off the aforesaid scheme without proper equipment. Dredging a river takes special heavy machinery.

55. To wit, to perform the Power Plant Contract, which also concerned the dredging of contaminants from a body of water, ERFS either purchased, leased-to-buy, made or had fabricated for it hundreds of thousands of dollars of dredging and other equipment (the "Equipment"). Obviously, it used and stored this Equipment at the Power Plant Contract site.

56. The Equipment included, *inter alia*, several underwater extraction pumps (each weighing several tons, and worth as much as several-hundred thousand dollars), electrical transformers, valuable piping and wiring, and other heavy construction equipment, materials and supplies.

57. In or about April and May 2018, Mick's friend's company – the Power Plant Contract site owner – contacted ERFS and asked ERFS to remove the Equipment from the Power Plant Contract site.

58. In or about late May 2018, ERFS reached a deal with Dave, paying him $10,000 to move the Equipment to a nearby "staging area," where ERFS would be able to put it onto trucks and return it to New Jersey.

59. Throughout late May and much of June 2018, Dave traveled to the Power Plant Contract site, used ERFS's accounts and monies to rent heavy machinery to help move the Equipment, and began to move the Equipment as he had promised he would.

60. As Mick had gone radio-silent, on several occasions during this time period, ERFS, its officers and its counsel directly asked Dave if he knew where Mick might be or if he had engaged in any communications with Mick. Each time, Dave not only denied that

he knew Mick's whereabouts and/or had any contact with Mick, he essentially stated that he did not care: Dave stressed to ERFS that, while he and Mick were once essentially a "team," Dave was now ready to "go his own way."

61. Alas, toward the end of June, around the same time that Mick admitted that he had worked with EAG to effectively steal stolen the Janesville Contract from ERFS, Dave vanished.

62. Worse still, so too did some of ERFS's most valuable Equipment – the Equipment Dave was supposed to be preparing for ERFS to bring back to New Jersey.

63. On July 6, 2018, ERFS was copied on an email to Dave from a manager Mick's friend's company. The manager's field crews reported that someone from ERFS had been on the Power Plant Project site and *removed* some of ERFS's equipment (i.e., not just *moved* it, but *took* it), but no one had heard from ERFS in more than a week.

64. Dave was the only ERFS representative at the Power Plant Project site, the only ERFS representative moving the Equipment, and the only ERFS representative communicating with Mick's friend's company regarding the Equipment move.

65. Furthermore, as ERFS was well aware, Dave had gone radio-silent roughly a week prior the email from Mick's friend's company – which coincided with the last time anyone from Mick's friend's company heard from Dave.

66. Around the same time ERFS received the email from Mick's friend's company, Mick again reached to ERFS's attorneys. On a conference call, Mick *admitted* he had taken into his possession some of ERFS's most valuable Equipment – which he needed and was planning to use in his effectuation of the Janesville Contract.

67. Mick indicated that he had coordinated with Dave to steal ERFS's Equipment.

14

68. He also intimated he coordinated the whole scheme with EAG.

### Dave Seeks Wages, Settles with ERFS – then Immediately Breaches (by, among other things Stealing the Equipment)

69. Evidence indicates Mick and Dave had been planning and laying certain groundwork for the aforesaid scheme for some time – likely months – before the Spring and Summer of 2018.

70. For instance, in or about April 2018, despite the fact his and Mick's collective incompetence and intentional fraudulent and otherwise harmful acts had essentially torpedoed ELS and left ERFS scrambling for its existence, Dave filed a complaint with the New Jersey Department of Labor (the "DOL"), seeking unpaid "wages."

71. As a first cut, while Dave and Mick may have been hired on at ERFS as employees (and, hence, would have been due "wages"), since they had so badly crippled ERFS's finances with their buffoonery, they had agreed to become independent contractors for ERFS and be paid on an irregular schedule (i.e., essentially, when ERFS could pay them, it would) until they had helped ELS and ERFS climb out of the hole they had created.

72. Nonetheless, Dave filed a complaint with the DOL's Wage Collection Section – an adjudicative and enforcement branch of the DOL that determines whether employees are due money from their employer, collects any such monies due (and transmits them to employees) and penalizes employers for any failure to pay.

73. In his complaint to the DOL, Dave ultimately sought $30,000 in unpaid wages.

74. Though it had a myriad of arguments it could have raised against Dave's claims, ERFS was in such bad financial shape (again, because of Mick and Dave), it did not have

resources to fully litigate the DOL complaint – or pay any lump sum judgment and/or penalty entered against it in the off chance it "lost" the case.

75. Additionally, Dave had expressed a desire to move on from ERFS. At the time, ERFS was not aware that Dave would "move on" to work with Mick, since, as stated *supra*, every time ERFS asked about Mick, Dave denied having any knowledge about him and any desire to work with him.

76. In any event, feeling boxed-in as a consequence of the aforesaid circumstances, and despite the fact it had still hoped Mick and Dave would keep their words and help ERFS recover, ERFS decided it was best and safest to reach a settlement with Dave, whereby would denounce any liability to Dave, but (i) release him from his noncompetition agreement, and (ii) essentially pay him (in an amortized fashion) to leave the company.

77. Accordingly, on or about June 27, 2018, ERFS and Dave reached a settlement agreement (the "Wilder Settlement"). The Wilder Settlement required ERFS to (i) pay Dave a sum of $70,000, broken into five monthly payments, and (ii) release Dave from liability for any acts Dave had committed against ERFS up until the Wilder Settlement's effective date, and (iii) absolve Dave of his noncompetition obligations to ERFS. The Wilder Settlement required Dave to (i) terminate his relationship with ERFS, (ii) dismiss his DOL complaint, and (iii) keep all discussions regarding and terms of the Wilder Settlement absolutely confidential. A true and accurate copy of the Wilder Settlement is attached hereto as **EXHIBIT C.**

16

78. The result was exactly what Dave wanted: Upon information and belief, he had filed his DOL complaint to create a paper trail that he had somehow been wronged by ERFS, and thus insulate himself from liability to ERFS.

79. Indeed, when questioned about why he filed the DOL complaint, Dave stated to ERFS's counsel that he had received advice from his own attorney, and would have "love[d]" for ERFS and its President/CEO to try and "come after him" after he filed it, because he would, in turn, file a whistleblower case against ERFS.

80. As intimated *supra*, nearly as soon as Dave executed the Wilder Settlement, he went radio-silent, and, upon strong information and belief, stole and transported ERFS's Equipment to Mick in Wisconsin.

81. Nonetheless, ERFS began to perform under the Wilder Settlement, making its first required payment to Dave.

82. However, after it became clear that Dave had very likely stolen its Equipment, ERFS delayed further payment until it could get some answers from Dave about what had occurred.

83. Dave contacted counsel to ERFS, asking whether further payments under the Wilder Settlement would be issued. ERFS's counsel confronted Dave about the stolen Equipment, and Dave did not deny that he had a hand in stealing it.

84. Instead, Dave went back to the DOL, and, upon information and belief, in a series of off-the-record calls with the DOL (that violated the express terms of the Wilder Settlement's confidentiality provisions), asserted that ERFS had not paid him $70,000 in wages. ERFS was not a party to these calls, as the DOL did not give ERFS notice of them. However, upon information and belief, Wilder's calls triggered the DOL to issue

a docket a judgment of more than $9,000 against ERFS. This has resulted in a New
Jersey-wide lien against ERFS, which has dramatically impacted ERFS's business and
reputation.

<u>Mick and Dave Pulled the Same Scheme on BioPath</u>

85. Though ERFS was not aware of it until far too late, it was not Mick and Dave's first
victim.

86. During ERFS's attempted execution of the Power Plant Contract, a former BioPath
investor sued Mick's friend's company, Mick, Dave and ERFS. Among other things,
the BioPath investor claimed that Mick and Dave had conspired with Mick's friend's
company to steal a contract from BioPath.

87. Interviews conducted by counsel to ERFS during discovery and their defense against
the suit painted what was, at the time, an incredibly confusing picture of Mick and
Dave – but a picture that nevertheless foreshadowed events to come. One former
BioPath principal stated and produced evidence that Mick and Dave had procured the
contract from his friend's company on BioPath's dime, then sabotaged BioPath's
efforts to perform under the contract, stole the contract, equipment and confidential,
proprietary information (including a proprietary BioPath chemical formulae worth,
as Mick has stated, millions of dollars) out from under BioPath and transferred it to
another company Mick and Dave had created in Wyoming.

88. ERFS addressed these accusations with Mick. While Mick did not entirely deny the
allegations, he did attempt to explain them: He told and showed documentary
evidence to ERFS that he had formed a company in Wyoming based on conversations
with an attorney for the BioPath "faction" of which he was a part, then transferred the

contract with his friend's company to the new company on the advice of that attorney. ERFS thus gave Mick the benefit of the doubt.

89. ERFS's investigation of the instant events indicates Mick may have also engaged in similar nefarious behavior at *other* companies (i.e., companies for or with which he worked *before* BioPath).

90. History has thus repeated itself: The viruses that are Mick and Dave have found a new "host" company, and they have left another business teetering on the brink of extinction.

## COUNT ONE – CONVERSION
### (Against All Defendants)

91. Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

92. Based on their various misdeeds, Defendants have converted, stolen and/or otherwise misappropriated Plaintiff's property to and for their own use and benefit without the authority to do so.

93. Defendants' conversion of Plaintiff's property has been knowing, intentional, wanton, willful, and an outrageous violation of Plaintiff's rights.

94. As a direct and proximate result of Defendants' conversion of Plaintiff's property, including, but not necessarily limited to, the Equipment, Plaintiff has suffered, continues to suffer and will continue to suffer damages.

## COUNT TWO – FRAUD
### (Against All Defendants)

95. Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

96. Defendants made various material misrepresentations and/or omissions to ERFS, including, but not limited to, repeated representations regarding (i) EAG's intent to engage ERFS in the Janesville contract, (ii) various Defendants' allegiance to ERFS, and (iii) the disposition of the Equipment.

97. Defendants made such misrepresentations and/or omissions knowingly and willfully, and with the intent to induce ERFS to rely thereon.

98. For instance, for more than a month, Defendants intentionally strung along ERFS regarding its candidacy for the Janesville Contract. Defendants ostensibly lied to ERFS that EAG would engage ERFS to conduct the River remediation. They also cloaked these lies in legitimacy -- going so far as to require that ERFS take steps that would be customary to such a transaction, like providing Defendants certain confidential and proprietary information, and adding EAG to ERFS's insurance policies. Upon information and belief, Defendants intentionally engaged in these lies to, among other things, procure ERFS's proprietary information (e.g., how ERFS might remediate the River, pricing information, etc.), which Defendants could then use to award the Janesville Contract to Mick, Dave, JDC (and/or any other entity with which they were affiliated) at a cut-rate price.

99. These various representations and/or omissions were material to various decisions ERFS made during its relationship with Defendants. For instance, based on these misrepresentations and omissions, ERFS in fact provided Defendants with proprietary and confidential information.

100.    ERFS reasonably relied on the misrepresentations and/or omissions made by Defendants to ERFS's detriment. For instance, EAG approached ERFS regarding the

Janesville Contract, and had a productive, longstanding working relationship with ERFS. As such, ERFS properly concluded that EAG's interest in retaining ERFS was legitimate. Moreover, ERFS sent its own agent – Mick – to "seal the deal," and rightly believed it could rely on this agency.

101.     As a direct, proximate and foreseeable result of the misrepresentations and omissions of Defendants, ERFS has suffered and will continue to suffer damages.

<u>**COUNT THREE – CIVIL CONSPIRACY**</u>
**(Against All Defendants)**

102.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

103.     The Defendants have acted in concert to commit unlawful acts by unlawful means through an agreement among themselves to inflict wrong upon various other businesses and contractors, including, but not necessarily limited to, Plaintiff.

104.     Each of the Defendants understood the general objectives of the scheme(s), accepted them, and agreed to do his, her or its part to further them.

105.     The Defendants committed multiple overt acts in furtherance of the conspiracy, including, but not limited to, (i) making various material misrepresentations to ERFS, as described *supra*, (ii) misappropriating proprietary ERFS information and utilizing same in the remediation of the River, and (iii) converting, stealing, and otherwise misappropriating ERFS's Equipment.

106.     As a direct and proximate result of the Defendants' overt acts of civil conspiracy, Plaintiff suffered, continues to suffer and will continue to suffer damages.

<u>**COUNT FOUR – VIOLATION OF RACKETEER INFLUENCED AND**</u>
<u>**CORRUPT ORGANIZATIONS ACT**</u>
**(Against Mick and Dave)**

21

107.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

108.     ERFS is a "person" within the meaning set forth in 18 U.S.C. § 1961(3).

109.     Though not a legal entity, Mick and Dave (i) are associated in fact and coordinated their efforts to defraud and otherwise harm ERFS, and, thus, (ii) for an "enterprise" within the meaning set forth in 18 U.S.C. § 1961(4).

110.     During the periods described and relevant herein, Mick and Dave conducted and/or participated, directly or indirectly, in a pattern of racketeering activity, consisting of numerous predicate acts, including, but not necessarily limited to, the theft of trade secrets (in violation of 18 U.S.C. § 1832), theft of property from an interstate shipment (in violation of 18 U.S.C. § 659), and the transportation and receipt of stolen property (in violation of 18 U.S.C. §§ 2314 and 2315).  Mick and Dave's commission of the aforesaid acts constitutes "racketeering activity" as set forth in 18 U.S.C. § 1961(1).

111.     Furthermore, Mick and Dave engaged in at least two acts of racketeering activity in the past 10 years, and, as such, their actions constitute a "pattern of racketeering" as set forth in 18 U.S.C. § 1961(5).

112.     In sum, as detailed *supra*, Mick and Dave engaged repeatedly in schemes to defraud companies of their proprietary information, steal their equipment and take their customers.

113.     As a direct and proximate result of Mick and Dave's violations of 18 U.S.C. 1962 (c) and (d), ERFS has suffered, continues to suffer, and will continue to suffer injury to its business and property.

22

## COUNT FIVE – RACKETEERING

114.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

115.    Plaintiff is a "person" within the meaning of N.J.S.A. 2C:41-1(b).

116.    The Defendants are an "enterprise" consisting of individuals and companies associated in fact within the meaning of N.J.S.A. 2C:41-1(c).

117.    At a minimum, since the commencement of EAG's flirtation with ERFS regarding the Janesville Contract, Defendants have conducted or participated in, directly or indirectly, a pattern of racketeering activity, in violation of N.J.S.A. 2C:41-2(c) and (d).

118.    The Defendants knowingly, willfully and unlawfully devised a scheme to defraud and steal from ERFS by, *inter alia*, and without limitation, (i) making false and/or fraudulent misrepresentations and/or omissions to ERFS regarding ERFS's candidacy for the Janesville Contract, (ii) making false and/or fraudulent misrepresentations and/or omissions to ERFS to induce ERFS to divulge confidential and proprietary information, and (iii) the theft of ERFS's equipment, in violation of N.J.S.A. 2C:41-1(n).

119.    Each of Defendants' false and/or misleading statements or omissions constitutes a separate and distinct offense in violation of N.J.S.A. 2C:21-7(e). In turn, each such offense violates N.J.S.A. 2C:41-1(a)(o).

120.    The racketeering activity described above constitutes a patter, in that it consists of numerous discrete but similar acts undertaken over a protracted period

of time, with each predicate act linked by common schemes and similarities, with the purpose of defrauding entities like Plaintiff.

121.    Defendants' various violations, including, but not limited to, their violations of N.J.S.A. 2C:41-1(n) and 2C:21-7(e), give rise to a claim by Plaintiff under N.J.S.A. 2C:41-4(c).

122.    As a direct and proximate result of the Defendants' violations of N.J.S.A. 2C:41-2(c) and (d), Plaintiff suffered, continues to suffer, and will continue to suffer damages.

### COUNT SIX – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Against Mick and Dave)

123.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

124.    ERFS had a longstanding business relationship with EAG, and, as a consequence, EAG approached ERFS regarding the River remediation and the Janesville Contract, and ERFS pursued the Janesville Contract.

125.    ERFS thus had a reasonable expectation of economic advantage and benefit therein. Presumably, in that EAG approached ERFS regarding the Janesville Contract, ERFS enjoyed a reasonable probability it would have secured the Janesville Contract's anticipated economic benefits.

126.    Though Mick was instructed by ERFS to "seal the deal" and finalize the Janesville Contract on behalf of ERFS, Mick instead procured the Janesville Contract for himself, Dave, JDC and/or another entity with whom or which he as affiliated.

127.    Dave furthered Mick's pilfering of the Janesville Contract via his conversion and delivery to Janesville, Wisconsin of ERFS's Equipment.

128.    Mick and Dave's interference with ERFS's continuation of its business relationship with EAG and its pursuit of the Janesville Contract was done intentionally, with malice, and without justification or excuse. To wit, Mick and Dave were both paid agents of ERFS, but, they nonetheless stole the Janesville Contract and otherwise precipitated the fracture of ERFS's relationship with EAG so that they could profit off the Janesville Contract and the commencement of *their* relationship with EAG.

129.    As a consequence of Mick and Dave's aforesaid actions, ERFS did not secure the Janesville Contract, and its relationship with EAG has splintered.

130.    As a direct and proximate result of Mick and Dave's interference with ERFS's relationship with EAG and its pursuit of the Janesville Contract, ERFS has suffered, continues to suffer, and will continue to suffer damages.

## COUNT SEVEN – BREACH OF CONTRACT
### (Against Mick and Dave)

131.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

132.    Without question, Mick and Dave's executive contracts with ERFS constituted valid contractual agreements between the parties.

133.    As stated above, both Mick's and Dave's ERFS contracts included express noncompete clauses, which forbade Mick and Dave from, *inter alia*, owning, managing, being employed by or rendering services to any entity that provided environmental remediation services or in any way competed with ERFS. In addition,

Mick and Dave's ERFS contracts precluded Mick and Dave from soliciting or accepting any business from any ERFS customer and/or inducing any ERFS customer to do business with any entity in competition with ERFS.

134.    As evinced by the various allegations foregoing, Mick and Dave have breached their executive agreements with ERFS, by, *inter alia*, (i) forming and/or being employed by and/or working on behalf of an entity or entities that directly compete with ERFS, and (ii) soliciting and/or accepting business from an ERFS customer.

135.    Additionally, Dave unquestionably breached the Wilder Settlement.

136.    As a direct and proximate result of the foregoing breaches, ERFS suffered, continues to suffer, and will continue to suffer damages.

**COUNT EIGHT – BREACH OF DUTY OF LOYALTY**
**(Against Mick and Dave)**

137.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

138.    As compensated representatives of ERFS, Mick and Dave owed a duty of loyalty to ERFS to act in the highest good faith and fidelity, and to act fairly and without self-dealing.

139.    By virtue of their conduct, more fully set forth *supra*, Mick and Dave, individually and/or collectively, have breached their common law duty of loyalty not to (a) use, disclose, or misappropriate ERFS's confidential, proprietary and trade secret information, (b) wrongfully compete with ERFS, and/or (c) otherwise unlawfully act contrary to ERFS's interests.

140.    By virtue of their aforementioned conduct, Mick and Dave have breached their duty of loyalty to ERFS. For instance, while representing ERFS and assigned to secure

the Janesville Contract for ERFS, Mick instead stole the Janesville Contract for himself, Dave and/or an entity with which Mick and/or Dave was affiliated. Similarly, while deployed to recover the Equipment for ERFS, Dave instead converted it and aided in its transportation to Wisconsin, where it could be used to further and help effectuate the Janesville Contract.

141.   As a consequence of these breaches, ERFS has sustained, continues to sustain, and will continue to sustain damages.

### COUNT NINE – UNJUST ENRICHMENT
### (Against All Defendants)

142.   Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

143.   Defendants were unjustly enriched by ERFS when, *inter alia*, (i) ERFS provided Defendants with confidential, proprietary and trade secret information, and (ii) Defendants received and utilized ERFS's Equipment in furtherance of their efforts to remediate the River and effectuate the Janesville Contract.

144.   Defendants were entitled to none of the above.

145.   Consequently, Defendants were unjustly enriched by ERFS, and ERFS sustained, continues to sustain and will continue to sustain damages.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor against the above-captioned Defendants, jointly and severally, for damages, compensatory damages punitive damages, together with prejudgment interest and costs of suit, including recovery of reasonable attorney's fees, and such other relief as the Court deems just and proper.

Respectfully submitted,

**MATSIKOUDIS & FANCIULLO, LLC**
**Attorneys for Plaintiff**

William Matsikoudis, Esq.

Dated: February 5, 2019
Jersey City, NJ


## JURY DEMAND

Pursuant to R. 4:35-1, Plaintiff demands trial of all litigable issues.

**MATSIKOUDIS & FANCIULLO, LLC**
**Attorneys for Plaintiff**

William Matsikoudis , Esq.

Dated: February 5, 2019
Jersey City, NJ


## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, William Matsikoudis, Esq. and Derek Fanciullo, Esq., of the law

firm of Matsikoudis & Fanciullo, are hereby designated as trial counsel for the Plaintiff.

**MATSIKOUDIS & FANCIULLO, LLC**
**Attorneys for Plaintiff**

William Matsikoudis, Esq.

Dated: February 5, 2019
Jersey City, NJ

28

## CERTIFICATION OF NO OTHER ACTIONS

Pursuant to R. 4:5-1, it is hereby stated that the matter in controversy is not the subject of any other action pending in any other court or of a pending arbitration proceeding to the best of my knowledge and belief. Also, to the best of my knowledge and belief, no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this pleading, I know of no other parties that should be joined in the above action. In addition, I recognize the continuing obligation of each party to file and serve on all parties and the court an amended certification if there is a change in the facts stated in this original certification.

**MATSIKOUDIS & FANCIULLO, LLC**
**Attorneys for Plaintiff**

William Matsikoudis, Esq.

Dated: February 5, 2019
Jersey City, NJ

29

## CERTIFICATION

Pursuant to the requirements of Rule 4:5-1 (NOTICE OF OTHER ACTIONS), I, the undersigned do hereby certify, to the best of my knowledge, information and belief, that except as hereinafter indicated, the subject matter of the controversy referred to in the within pleading is not the subject of any other Cause of Action, pending in any other court, or of a pending Arbitration Proceeding, nor is any other Cause of Action or Arbitration Proceeding contemplated:

1.  OTHER ACTIONS PENDING                                      YES___NO_X_

    A.  If Yes – Parties to other Pending Actions
        Superior Court, Docket No.:
    B.  In my opinion, the following parties should
        Be joined in the within pending Cause of Action.

2.  OTHER ACTIONS CONTEMPLATED?                                YES___NO_X_

    A.  If Yes – Parties contemplated to be joined
        in other Causes of Action.

3.  ARBITRATION PROCEEDINGS CONTEMPLATED?                      YES___NO_X_

    A.  If Yes – Parties to Arbitration Proceedings            YES___NO_X_
    B.  In my opinion, the following parties should
        Be joined in the pending Arbitration
        Proceedings.

4.  OTHER ARBITRATION PROCEEDINGS CONTEMPLATED?                YES___NO_X_

    A.  If Yes – Parties contemplated to be joined to
        Arbitration Proceedings.

In the event that, during the pendency of the within Cause of Action, I shall become aware of any change as to the facts stated herein, I shall file an amended certification and serve a copy thereof on all other parties (or their attorneys) who have appeared in said Cause of Action.

                                        **MATSIKOUDIS & FANCIULLO, LLC**
                                        **Attorneys for Plaintiff**


                                        _____
                                        William Matsikoudis, Esq.

Dated: February 5, 2019
        Jersey City, NJ

30

# Civil Case Information Statement

**Case Details: HUDSON | Civil Part Docket# L-000540-19**

**Case Caption:** ENVT'L REM. AND FIN.  SVCS. LL  VS ENVIROANALYTIC

**Case Initiation Date:** 02/05/2019

**Attorney Name:** DEREK SCOTT FANCIULLO

**Firm Name:** MATSIKOUDIS & FANCIULLO, LLC

**Address:** 128 MONTICELLO AVE STR 1
JERSEY CITY NJ 07304

**Phone:**

**Name of Party:** PLAINTIFF : Envt'l Rem. and Fin. Svcs. LLC

**Name of Defendant's Primary Insurance Company**
**(if known):** Unknown

**Case Type:** TORT-OTHER

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 12 JURORS

**Hurricane Sandy related?** NO

**Is this a professional malpractice case?**  NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

---

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**
CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Employer/Employee

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
**If yes, for what language:**

---

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

02/05/2019
Dated

/s/ DEREK SCOTT FANCIULLO
Signed

# EXHIBIT A

## AT-WILL
## EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is entered into as of the date of the last signature affixed hereto, by and between Environmental Remediation and Financial Services, LLC, a New Jersey Limited Liability Company ("ERFS" or the "Company"), and Michael Warner (the "Employee").

In consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, ERFS and Employee hereby agree as follows:

1. Position of Employment.

    a. Title. The Company will employ the Employee in the position of President of Land Services Division (the "Division") of ERFS and, in that position, Employee will report to the Chief Executive Officer of ERFS. ERFS retains the right to, at any time, and in its sole discretion, change Employee's title, duties, and reporting relationships, provided, however, that any such change in Employee's duties shall be consistent with Employee's training, experience, and qualifications, which characteristics the company shall determine in its reasonable judgment.

    b. General Terms. The terms and conditions of the Employee's employment shall, to the extent not addressed or described in this Employment Agreement, be governed by ERFS Company's Policies and Procedures Manual and existing practices. In the event of a conflict between this Employment Agreement and the Policies and Procedures Manual or existing practices, the terms of this Agreement shall govern.

    c. Employee Not Subject to Restrictive Covenants. Employee acknowledges and affirms that Employee's ability to engage in this Agreement, perform the duties described herein, and receive compensation for such performance as defined herein, is not and will not be, whether in whole or in part, limited by the enforcement of any restrictive covenant(s) against him.

2. Term of Employment.

    a. Employee's employment with ERFS Company shall commence on September 6, 2016, and shall be on an "at will" basis, unless:

        1. Employee's employment is terminated by either party in accordance with the terms of Section 5 of this Agreement; or

        2. Such term of employment is extended or shortened by a subsequent agreement duly executed by each of the parties to this Agreement, in which case such employment shall be subject to the terms and conditions contained in the subsequent written agreement.

3.  Compensation and Benefits.

    a.  Base Salary. Employee shall be paid a base salary of Ten Thousand Dollars ($10,000.00) per month, which is One Hundred Twenty Thousand Dollars ($120,000.00) annually ("Base Salary").

    b.  Contingent Draw. If, during any calendar month during the Term of this Agreement, Employee generates a minimum of One Hundred Thousand Dollars ($100,000) in (i) invoicing for work done exclusively by Employee, and/or (ii) revenue for the Division through new business opportunities Employee has either introduced to or secured for the Division, Employee shall receive, in the following calendar month, pursuant to the terms of subpart (c) of this Section, a Two Thousand Five Hundred Dollar ($2,500.00) non-recoverable draw (each such earned installment, a "Draw"). Draw not earned in a monthly period can be recovered in a later month with over $200,000 in collections and or invoicing under the same terms.

    c.  Mode of Payment. The Base Salary and any Draw earned by Employee pursuant to subpart (b) of this Section shall be subject to applicable federal, state, and local withholding, and shall to be paid to Employee in the same manner and on the same payroll schedule that all ERFS employees receive payment.

    d.  Increased Compensation. Any and all increases in Employee's Base Salary shall be at the sole discretion of ERFS, and nothing herein shall be deemed to require any such increase.

    e.  Incentive and Deferred Compensation. Employee shall be eligible to participate in all incentive and deferred compensation programs available to other executives or officers of ERFS Company, such participation to be in the same form, under the same terms, and to the same extent that such programs are made available to other such executives or officers. Nothing in this Employment Agreement shall be deemed to require the payment of bonuses, awards, or incentive compensation to Employee if such payment would not otherwise be required under the terms of ERFS Company's incentive compensation programs.

    f.  Employee Benefits. Employee shall be eligible to participate in all employee benefit plans, policies, programs, or perquisites in which other ERFS Company executive or officers participate, including the ERFS Company Stock Option program. The terms and conditions of Employee's participation in ERFS Company's employee benefit plans, policies, programs, or perquisites shall be governed by the terms of each such plan, policy, or program.

4.  Duties and Performance. The Employee acknowledges and agrees that he is being offered a position of employment by the Company with the understanding that the Employee possesses a unique set of skills, abilities, and experiences which will benefit the Company,

and he agrees that his continued employment with the Company, whether during the term of this Employment Agreement or thereafter, is contingent upon his successful performance of his duties in his position as noted above, or in such other position to which he may be assigned.

    a.  <u>General Duties</u>.

        1.  Employee shall render to the very best of Employee's ability, on behalf of the Company, services to and on behalf of the Company, and shall undertake diligently all duties assigned to him by the Company.

        2.  Employee shall devote his full time, energy and skill to the performance of the services in which the Company is engaged, at such time and place as the Company may direct. Employee shall not undertake, either as an owner, director, shareholder, employee or otherwise, the performance of services for compensation (actual or expected) for any other entity without the express written concert of the President or the Board of Directors.

        3.  Employee shall faithfully and industriously assume and perform with skill, care, diligence and attention all responsibilities and duties connected with his employment on behalf of the Company.

        4.  Employee shall have no authority to enter into any contracts binding upon the Company, or to deliberately create any obligations on the part of the Company, except as may be specifically authorized by the President or Board of Directors of ERFS Company.

    b.  <u>Specific Duties</u>. Employee shall:

        1.  Lead business development of Division services.

        2.  Identify staff needed to fulfill contracts and lead staff recruitment.

        3.  Participate in strategic planning for ERFS.

        4.  Participate in research and development.

5.  <u>Termination of Employment</u>. Employee's employment with the Company may be terminated, prior to the expiration of the term of this Employment Agreement, in accordance with any of the following provisions:

    a.  <u>Termination by Employee</u>. The Employee may terminate his employment at any time during the course of this agreement by giving four (4) weeks' notice, in writing, to the President of ERFS. During the period after Employee gives such notice but prior to the date of Employee's termination (the "Employee Notification Period"), Employee must fulfill all his duties and responsibilities set forth above

and use his best efforts to train and support his replacement, if any. Failure to comply with this requirement may result in Termination for Cause described below, but, otherwise, Employee shall be paid any Base Salary and Draw due Employee during the Employee Notification Period, and Employee's benefits shall remain unchanged during the Employee Notification Period.

b.   Termination by the Company Without Cause. ERFS Company may terminate Employee's employment at any time during the course of this agreement by giving four (4) weeks' notice, in writing, to the Employee. During the period after Employer gives such notice but prior to the date of Employee's termination ("Employer Notification Period"), Employee must fulfill all of Employee's duties and responsibilities set forth above and use Employee's best efforts to train and support Employee's replacement, if any. Failure of Employee to comply with this requirement may result in Termination for Cause described below, but, otherwise, Employee shall be paid any Base Salary and Draw due Employee during the Employer Notification Period, and Employee's benefits shall remain unchanged during the Employer Notification Period., provided, however, that ERFS may, in its sole discretion, and at any time during the Employer Notification Period, provide, in lieu of actual employment, Employee severance pay totaling the amount due Employee for the remainder of the Employer Notification Period, whereafter Employee shall be terminated with immediate effect, and nothing herein shall require Company to maintain employee in active employment for the duration of the notice period.

c.   Termination by the Company For Cause. The Company may, at any time and without notice, terminate the Employee for "cause." Termination by the Company of the Employee for "cause" shall include, but not be limited to, termination based on any of the following grounds: (a) failure to perform the duties of the Employee's position in a satisfactory manner; (b) fraud, misappropriation, embezzlement or acts of similar dishonesty; (c) conviction of a felony involving moral turpitude; (d) illegal use of drugs or excessive use of alcohol in the workplace; (e) intentional and willful misconduct that may subject the Company to criminal or civil liability; (f) breach of the Employee's duty of loyalty, including the diversion or usurpation of corporate opportunities properly belonging to the Company; (g) willful disregard of Company policies and procedures; (h) breach of any of the material terms of this Agreement; (i) insubordination or deliberate refusal to follow the instructions of the President of ERFS Company; and (j) in any Company Fiscal Year (a "CFY"), pursuant to a good-faith accounting of the Division by the Company at the conclusion of the CFY, the Division's liabilities and/or expenses for the CFY, including, *inter alia*, the compensation paid to or otherwise due Employee pursuant to this Agreement, exceed the Division's income for the CFY.

d.   Termination By Death or Disability. The Employee's employment and rights to compensation under this Employment Agreement shall terminate if the Employee is unable to perform the duties of his position due to death or disability lasting more than 90 days, and the Employee's heirs, beneficiaries, successors, or assigns shall

not be entitled to any of the compensation or benefits to which Employee is entitled under this Agreement, except: (a) to the extent specifically provided in this Employment Agreement (b) to the extent required by law; or (c) to the extent that such benefit plans or policies under which Employee is covered provide a benefit to the Employee's heirs, beneficiaries, successors, or assigns.

6. Confidentiality. Employee agrees that at all times during Employee's employment, and following the conclusion of Employee's employment, whether Employee's Termination of Employment, as set forth in Section 5 of this Agreement, is voluntary or involuntary, for as long as such information remains non-public information, Employee shall hold in strictest confidence and not disclose Confidential Information (as defined below) to anyone who is not also an employee of the Company or to any employee of the Company who does not also have access to such Confidential Information, without express written authorization of the President of the Company. Additionally, Employee will not use any Confidential Information for Employee's own benefit or to the detriment of the Company during Employee's employment or thereafter. Employee also certifies that employment with the Company does not and will not breach any agreement or duty that Employee has to anyone concerning confidential information belonging to others.

   a. "Confidential Information" shall mean any trade secrets or Company proprietary information, including but not limited to manufacturing techniques, processes, formulas, customer lists, inventions, experimental developments, research projects, operating methods, cost, pricing, financial data, business plans and proposals, data and information the Company receives in confidence from any other party, or any other secret or confidential matters of the Company.

   b. "Immunity from Liability for Confidential Disclosure of a Trade Secret to the Government or in a Court Filing":

   (1) Immunity—An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that—(A) is made—(i) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

   (2) Use of Trade Secret Information in Anti-Retaliation Lawsuit—An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual—(A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order."

7. Noncompetition. In consideration of his employment and the other benefits arising under this Agreement, the Employee agrees that Employee shall not, directly or indirectly:

a. During the Employee's Term of Employment, and for twelve (12) months thereafter, own, manage, operate, join, control or participate in the ownership, management, operation or control of, or be employed or retained by, render services (including consulting services) to, provide financing (equity or debt) or advice to, or otherwise be connected in any manner with any business that at any time engages in environmental remediation, provides services (including consulting services) related to environmental remediation, or otherwise competes, either directly or indirectly with the business conducted by the Company, provided, however, that nothing contained herein shall prevent the purchase or ownership by Employee of less than one percent (1%) f the outstanding equity securities of any class of securities of a company registered under Section 12 of the Securities Exchange Act of 1934, as amended; or

b. During the Employment Period, and for eighteen (18) months thereafter, for any reason, (i) induce any customer or supplier of the Company or any of its subsidiaries or affiliates, to patronize or do business with any business directly or indirectly in competition with the business conducted by the Company or any of its subsidiaries or affiliates; (ii) canvass, solicit or accept from any customer or supplier of the Company, or any of its subsidiaries or affiliates, any such competitive business; or (iii) request or advise any customer or vendor of the Company, or any of its subsidiaries or affiliates, to withdraw, curtail or cancel any such customer's or vendor's business with the Company, or any of its subsidiaries or affiliates; or

c. For any reason, employ, or knowingly permit any company or business directly or indirectly controlled by Employee to employ, any person who was employed by the Company, or any of its subsidiaries or affiliates, at or within the prior twelve (12) month period, or in any manner, seek to induce any such person to leave his or her employment.

d. Restricts from 7a, 7b and 7c cannot be longer than service to the Company and Division.

8. Assignment. This Agreement, and Employees rights, duties and responsibilities hereunder, may not be assigned or delegated by Employee. The Company may assign its rights hereunder and delegate its obligations hereunder to any affiliate of the Company, or any successor to the Company, specifically including the restrictive covenants included in Sections 6 and 7 hereof. The rights and obligations of the Company under this Agreement shall inure to the benefit of and be binding upon its respective successors and assigns.

9. Expenses. The Company shall pay or reimburse Employee for any expenses reasonably incurred by him in furtherance of his duties hereunder, including expenses for entertainment, travel, meals and hotel accommodations, upon submission by him of vouchers or receipts maintained and provided to the Company in compliance with such rules and policies relating thereto as the Company may from time to time adopt.

10. General Provisions.

    a.  Notices. All notices and other communications required or permitted by this Agreement to be delivered by ERFS or Employee to the other party shall be delivered in writing to the addresses shown below, either personally, by facsimile transmission or by registered, certified or express mail, return receipt requested, postage prepaid, to the address for such party specified below or to such other address as the party may from time to time advise the other party, and shall be deemed given and received as of actual personal delivery, on the first business day after the date of delivery shown on any such facsimile transmission or upon the date or actual receipt shown on any return receipt if registered, certified or express mail is used, as the case may be.:

ERFS Company:

        Mark Vigneri
        President and CEO
        ERFS.
        2150 Highway 35, Suite 250
        Sea Girt, NJ 08750

Employee:

        Michael Warner
        4939 Borchers Beach Road
        Waunakee, WI 53597

    b.  Amendments and Termination. This Agreement may not be amended or terminated except by a writing executed by all of the parties hereto.

    c.  Entire Agreement. This Agreement constitutes the entire agreement of ERFS Company and Employee relating to the subject matter hereof and supersedes all prior oral and written understandings and agreements relating to such subject matter.

    d.  Severability; In the event that any provision of this Agreement is found to be void and unenforceable by a court of competent jurisdiction, then such unenforceable provision shall be deemed modified so as to be enforceable (or, if not subject to or capable of modification, then eliminated herefrom) to the extent necessary to permit the remaining provisions to be enforced in accordance with the intention of the Parties. The provisions of Sections 6 and 7 shall survive the termination for any reason of the Employee's relationship with the Company.

    e.  Waiver of Rights. No waiver by ERFS Company or Employee of a right or remedy hereunder shall be deemed to be a waiver of any other right or remedy or of any subsequent right or remedy of the same kind.

f.  Definitions, Headings and Numbers. A term defined in any part of this Employment Agreement shall have the defined meaning wherever such term is used herein. The headings contained in this Agreement are for reference purposes only and shall not affect in any manner the meaning or interpretation of this Employment Agreement. Where appropriate to the context of this Agreement, use of the singular shall be deemed also to refer to the plural, and use of the plural to the singular.

g.  Counterparts. This Agreement may be executed in separate counterparts, each of which shall be deemed an original but both of which taken together shall constitute but one and the same instrument.

h.  Governing Laws and Forum. This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of New Jersey. The parties hereto further agree that any action brought to enforce any right or obligation under this Agreement shall be subject to the exclusive jurisdiction of the courts of the State of New Jersey.

IN WITNESS WHEREOF, ERFS Company and Employee have executed and delivered this Agreement as of the date written below.

By: _____

Name: Michael Warner

Date:  September 6, 2016

ERFS
By: _____

Name: Mark Vigneri

Title:  President & CEO

Date: September 6, 2016

# EXHIBIT B

## AT-WILL
## EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is entered into as of the date of the last signature affixed hereto, by and between Environmental Remediation and Financial Services, LLC, a New Jersey Limited Liability Company ("ERFS" or the "Company"), and Dave Wilder (the "Employee").

In consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, ERFS and Employee hereby agree as follows:

1. Position of Employment.

   a. Title. The Company will employ the Employee in the position of Senior Vice President of Land Services Division (the "Division") of ERFS and, in that position, Employee will report to the Chief Executive Officer of ERFS. ERFS retains the right to, at any time, and in its sole discretion, change Employee's title, duties, and reporting relationships, provided, however, that any such change in Employee's duties shall be consistent with Employee's training, experience, and qualifications, which characteristics the company shall determine in its reasonable judgment.

   b. General Terms. The terms and conditions of the Employee's employment shall, to the extent not addressed or described in this Employment Agreement, be governed by ERFS Company's Policies and Procedures Manual and existing practices. In the event of a conflict between this Employment Agreement and the Policies and Procedures Manual or existing practices, the terms of this Agreement shall govern.

   c. Employee Not Subject to Restrictive Covenants. Employee acknowledges and affirms that Employee's ability to engage in this Agreement, perform the duties described herein, and receive compensation for such performance as defined herein, is not and will not be, whether in whole or in part, limited by the enforcement of any restrictive covenant(s) against him.

2. Term of Employment.

   a. Employee's employment with ERFS Company shall commence on September 6, 2016, and shall be on an "at will" basis, unless:

      1. Employee's employment is terminated by either party in accordance with the terms of Section 5 of this Agreement; or

      2. Such term of employment is extended or shortened by a subsequent agreement duly executed by each of the parties to this Agreement, in which case such employment shall be subject to the terms and conditions contained in the subsequent written agreement.

3. <u>Compensation and Benefits</u>.

    a. <u>Base Salary</u>. Employee shall be paid a base salary of Ten Thousand Dollars ($10,000.00) per month, which is One Hundred Twenty Thousand Dollars ($120,000.00) annually ("Base Salary").

    b. <u>Contingent Draw. If, during any calendar month during the Term of this Agreement, Employee generates a minimum of One Hundred Thousand Dollars ($100,000) in (i) invoicing for work done exclusively by Employee, and/or (ii) revenue for the Division through new business opportunities Employee has either introduced to or secured for the Division, Employee shall receive, in the following calendar month, pursuant to the terms of subpart (c) of this Section, a</u> Two Thousand Five Hundred Dollar ($2,500.00) non-recoverable draw (each such earned installment, a "Draw"). Draw not earned in a monthly period can be recovered in a later month with over $200,000 in collections and or invoicing under the same terms.

    c. <u>Mode of Payment</u>. The Base Salary and any Draw earned by Employee pursuant to subpart (b) of this Section shall be subject to applicable federal, state, and local withholding, and shall to be paid to Employee in the same manner and on the same payroll schedule that all ERFS employees receive payment.

    d. Increased <u>Compensation. Any</u> and all increases in Employee's Base Salary shall be at the sole discretion of ERFS, and nothing herein shall be deemed to require any such increase.

    e. <u>Incentive and Deferred Compensation</u>. Employee shall be eligible to participate in all incentive and deferred compensation programs available to other executives or officers of ERFS Company, such participation to be in the same form, under the same terms, and to the same extent that such programs are made available to other such executives or officers. Nothing in this Employment Agreement shall be deemed to require the payment of bonuses, awards, or incentive compensation to Employee if such payment would not otherwise be required under the terms of ERFS Company's incentive compensation programs.

    f. <u>Employee Benefits</u>. Employee shall be eligible to participate in all employee benefit plans, policies, programs, or perquisites in which other ERFS Company executive or officers participate, including the ERFS Company Stock Option program. The terms and conditions of Employee's participation in ERFS Company's employee benefit plans, policies, programs, or perquisites shall be governed by the terms of each such plan, policy, or program.

4. <u>Duties and Performance</u>. The Employee acknowledges and agrees that he is being offered a position of employment by the Company with the understanding that the Employee possesses a unique set of skills, abilities, and experiences which will benefit the Company,

and he agrees that his continued employment with the Company, whether during the term of this Employment Agreement or thereafter, is contingent upon his successful performance of his duties in his position as noted above, or in such other position to which he may be assigned.

    a. <u>General Duties</u>.

        1. Employee shall render to the very best of Employee's ability, on behalf of the Company, services to and on behalf of the Company, and shall undertake diligently all duties assigned to him by the Company.

        2. Employee shall devote his full time, energy and skill to the performance of the services in which the Company is engaged, at such time and place as the Company may direct. Employee shall not undertake, either as an owner, director, shareholder, employee or otherwise, the performance of services for compensation (actual or expected) for any other entity without the express written concert of the President or the Board of Directors.

        3. Employee shall faithfully and industriously assume and perform with skill, care, diligence and attention all responsibilities and duties connected with his employment on behalf of the Company.

        4. Employee shall have no authority to enter into any contracts binding upon the Company, or to deliberately create any obligations on the part of the Company, except as may be specifically authorized by the President or Board of Directors of ERFS Company.

    b. <u>Specific Duties</u>. Employee shall:

        1. Lead operations of the Division.

        2. Identify staff needed to fulfill contracts and lead staff recruitment.

        3. Participate in strategic planning for ERFS.

        4. Participate in research and development.

5. <u>Termination of Employment</u>. Employee's employment with the Company may be terminated, prior to the expiration of the term of this Employment Agreement, in accordance with any of the following provisions:

    a. <u>Termination by Employee</u>. The Employee may terminate his employment at any time during the course of this agreement by giving four (4) weeks' notice, in writing, to the President of ERFS. During the period after Employee gives such notice but prior to the date of Employee's termination (the "Employee Notification Period"), Employee must fulfill all his duties and responsibilities set forth above

and use his best efforts to train and support his replacement, if any. Failure to comply with this requirement may result in Termination for Cause described below, but, otherwise, Employee shall be paid any Base Salary and Draw due Employee during the Employee Notification Period, and Employee's benefits shall remain unchanged during the Employee Notification Period.

b.  <u>Termination by the Company Without Cause</u>. ERFS Company may terminate Employee's employment at any time during the course of this agreement by giving four (4) weeks' notice, in writing, to the Employee. During the period after Employer gives such notice but prior to the date of Employee's termination ("Employer Notification Period"), Employee must fulfill all of Employee's duties and responsibilities set forth above and use Employee's best efforts to train and support Employee's replacement, if any. Failure of Employee to comply with this requirement may result in Termination for Cause described below, but, otherwise, Employee shall be paid any Base Salary and Draw due Employee during the Employer Notification Period, and Employee's benefits shall remain unchanged during the Employer Notification Period., provided, however, that ERFS may, in its sole discretion, and at any time during the Employer Notification Period, provide, in lieu of actual employment, Employee severance pay totaling the amount due Employee for the remainder of the Employer Notification Period, whereafter Employee shall be terminated with immediate effect, and nothing herein shall require Company to maintain employee in active employment for the duration of the notice period.

c.  <u>Termination by the Company For Cause</u>. The Company may, at any time and without notice, terminate the Employee for "cause." Termination by the Company of the Employee for "cause" shall include, but not be limited to, termination based on any of the following grounds: (a) failure to perform the duties of the Employee's position in a satisfactory manner; (b) fraud, misappropriation, embezzlement or acts of similar dishonesty; (c) conviction of a felony involving moral turpitude; (d) illegal use of drugs or excessive use of alcohol in the workplace; (e) intentional and willful misconduct that may subject the Company to criminal or civil liability; (f) breach of the Employee's duty of loyalty, including the diversion or usurpation of corporate opportunities properly belonging to the Company; (g) willful disregard of Company policies and procedures; (h) breach of any of the material terms of this Agreement; (i) insubordination or deliberate refusal to follow the instructions of the President of ERFS Company; and (j) in any Company Fiscal Year (a "CFY"), pursuant to a good-faith accounting of the Division by the Company at the conclusion of the CFY, the Division's liabilities and/or expenses for the CFY, including, *inter alia*, the compensation paid to or otherwise due Employee pursuant to this Agreement, exceed the Division's income for the CFY.

d.  <u>Termination By Death or Disability</u>. The Employee's employment and rights to compensation under this Employment Agreement shall terminate if the Employee is unable to perform the duties of his position due to death or disability lasting more than 90 days, and the Employee's heirs, beneficiaries, successors, or assigns shall

not be entitled to any of the compensation or benefits to which Employee is entitled under this Agreement, except: (a) to the extent specifically provided in this Employment Agreement (b) to the extent required by law; or (c) to the extent that such benefit plans or policies under which Employee is covered provide a benefit to the Employee's heirs, beneficiaries, successors, or assigns.

6. Confidentiality. Employee agrees that at all times during Employee's employment, and following the conclusion of Employee's employment, whether Employee's Termination of Employment, as set forth in Section 5 of this Agreement, is voluntary or involuntary, for as long as such information remains non-public information, Employee shall hold in strictest confidence and not disclose Confidential Information (as defined below) to anyone who is not also an employee of the Company or to any employee of the Company who does not also have access to such Confidential Information, without express written authorization of the President of the Company. Additionally, Employee will not use any Confidential Information for Employee's own benefit or to the detriment of the Company during Employee's employment or thereafter. Employee also certifies that employment with the Company does not and will not breach any agreement or duty that Employee has to anyone concerning confidential information belonging to others.

   a. "Confidential Information" shall mean any trade secrets or Company proprietary information, including but not limited to manufacturing techniques, processes, formulas, customer lists, inventions, experimental developments, research projects, operating methods, cost, pricing, financial data, business plans and proposals, data and information the Company receives in confidence from any other party, or any other secret or confidential matters of the Company.

   b. "Immunity from Liability for Confidential Disclosure of a Trade Secret to the Government or in a Court Filing":

   (1) Immunity—An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that—(A) is made—(i) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

   (2) Use of Trade Secret Information in Anti-Retaliation Lawsuit—An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual—(A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order."

7. Noncompetition. In consideration of his employment and the other benefits arising under this Agreement, the Employee agrees that Employee shall not, directly or indirectly:

a. During the Employee's Term of Employment, and for twelve (12) months thereafter, own, manage, operate, join, control or participate in the ownership, management, operation or control of, or be employed or retained by, render services (including consulting services) to, provide financing (equity or debt) or advice to, or otherwise be connected in any manner with any business that at any time engages in environmental remediation, provides services (including consulting services) related to environmental remediation, or otherwise competes, either directly or indirectly with the business conducted by the Company, provided, however, that nothing contained herein shall prevent the purchase or ownership by Employee of less than one percent (1%) f the outstanding equity securities of any class of securities of a company registered under Section 12 of the Securities Exchange Act of 1934, as amended; or

b. During the Employment Period, and for eighteen (18) months thereafter, for any reason, (i) induce any customer or supplier of the Company or any of its affiliates or affiliates, to patronize or do business with any business directly or indirectly in competition with the business conducted by the Company or any of its subsidiaries or affiliates; (ii) canvass, solicit or accept from any customer or supplier of the Company, or any of its subsidiaries or affiliates, any such competitive business; or (iii) request or advise any customer or vendor of the Company, or any of its subsidiaries or affiliates, to withdraw, curtail or cancel any such customer's or vendor's business with the Company, or any of its subsidiaries or affiliates; or

c. For any reason, employ, or knowingly permit any company or business directly or indirectly controlled by Employee to employ, any person who was employed by the Company, or any of its subsidiaries or affiliates, at or within the prior twelve (12) month period, or in any manner, seek to induce any such person to leave his or her employment.

d. Restricts from 7a, 7b and 7c cannot be longer than service to the Company and Division.

8. **Assignment.** This Agreement, and Employees rights, duties and responsibilities hereunder, may not be assigned or delegated by Employee. The Company may assign its rights hereunder and delegate its obligations hereunder to any affiliate of the Company, or any successor to the Company, specifically including the restrictive covenants included in Sections 6 and 7 hereof. The rights and obligations of the Company under this Agreement shall inure to the benefit of and be binding upon its respective successors and assigns.

9. **Expenses.** The Company shall pay or reimburse Employee for any expenses reasonably incurred by him in furtherance of his duties hereunder, including expenses for entertainment, travel, meals and hotel accommodations, upon submission by him of vouchers or receipts maintained and provided to the Company in compliance with such rules and policies relating thereto as the Company may from time to time adopt.

10. General Provisions.

    a.  Notices. All notices and other communications required or permitted by this Agreement to be delivered by ERFS or Employee to the other party shall be delivered in writing to the addresses shown below, either personally, by facsimile transmission or by registered, certified or express mail, return receipt requested, postage prepaid, to the address for such party specified below or to such other address as the party may from time to time advise the other party, and shall be deemed given and received as of actual personal delivery, on the first business day after the date of delivery shown on any such facsimile transmission or upon the date or actual receipt shown on any return receipt if registered, certified or express mail is used, as the case may be.:

ERFS Company:

        Mark Vigneri
        President and CEO
        ERFS.
        2150 Highway 35, Suite 250
        Sea Girt, NJ 08750

Employee:

        David Wilder
        307 Stonebrook Drive
        Clayton, NC  27520

    b.  Amendments and Termination. This Agreement may not be amended or terminated except by a writing executed by all of the parties hereto.

    c.  Entire Agreement. This Agreement constitutes the entire agreement of ERFS Company and Employee relating to the subject matter hereof and supersedes all prior oral and written understandings and agreements relating to such subject matter.

    d.  Severability: In the event that any provision of this Agreement is found to be void and unenforceable by a court of competent jurisdiction, then such unenforceable provision shall be deemed modified so as to be enforceable (or, if not subject to or capable of modification, then eliminated herefrom) to the extent necessary to permit the remaining provisions to be enforced in accordance with the intention of the Parties. The provisions of Sections 6 and 7 shall survive the termination for any reason of the Employee's relationship with the Company.

    e.  Waiver of Rights. No waiver by ERFS Company or Employee of a right or remedy hereunder shall be deemed to be a waiver of any other right or remedy or of any subsequent right or remedy of the same kind.

f. <u>Definitions, Headings and Numbers</u>. A term defined in any part of this Employment Agreement shall have the defined meaning wherever such term is used herein. The headings contained in this Agreement are for reference purposes only and shall not affect in any manner the meaning or interpretation of this Employment Agreement. Where appropriate to the context of this Agreement, use of the singular shall be deemed also to refer to the plural, and use of the plural to the singular.

g. <u>Counterparts</u>. This Agreement may be executed in separate counterparts, each of which shall be deemed an original but both of which taken together shall constitute but one and the same instrument.

h. <u>Governing Laws and Forum</u>. This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of New Jersey. The parties hereto further agree that any action brought to enforce any right or obligation under this Agreement shall be subject to the exclusive jurisdiction of the courts of the State of New Jersey.

IN WITNESS WHEREOF, ERFS Company and Employee have executed and delivered this Agreement as of the date written below.

By: _____

Name: David Wilder

Date: September 6, 2016

ERFS
By: _____

Name: Mark Vigneri

Title: President & CEO

Date: September 6, 2016

# EXHIBIT C

33

## SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into as of June 29, 2018 (the "Effective Date"), by and between Environmental Remediation and Financial Services, LLC ("ERFS"), a New Jersey limited liability company with a principal place of business at 2150 Highway 35, Suite 250, Sea Girt, New Jersey, Mark Vigneri ("Vigneri"), an individual and ERFS's President and CEO, and David Wilder ("Wilder," and, together with ERFS and Vigneri, the "Parties," and, each, a "Party"), an individual with a residence, offices and/or a principal workplace at 307 Stonebrook Drive, Clayton, North Carolina.

WHEREAS, Wilder is an executive with and of ERFS's Land Services Division ("ELS");

WHEREAS, Wilder has instituted an action against ERFS with the State of New Jersey Department of Labor and Workforce Development (the "DOL"), entitled Wilder v. Vigneri, et al., and assigned case number WC-407-0318-WAL (the "Action"), which alleges, *inter alia*, Wilder was an employee of ERFS and, between September 6, 2016 and March 7, 2018, ERFS failed to pay "the sum of $30,000" in "wages" to Wilder;

WHEREAS, Wilder also claims ERFS owes him $49,479.75 in allegedly unpaid bonus and incentive payments and other monies;

WHEREAS, ERFS denies any and all allegations asserted in the Action, and further denies that any of Wilder's claims have merit; and

WHEREAS, the Parties, desiring to avoid litigation and the associated costs, seek to amicably resolve any claims and controversies between them, and have now agreed to the terms of a settlement in order to fully and finally settle, compromise, resolve and release all claims, actions, appeals, disputes, grievances, disagreements, differences, debts, accounts, demands, contracts, lawsuits, and causes of action that presently exist or may exist, without any admission of liability or wrongdoing.

NOW, THEREFORE, for and in consideration of the mutual promises, covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each Party, and for the benefit of the Parties, the Parties agree as follows:

1. **Settlement Payments.**

   a. ERFS or Vigneri shall pay to Wilder a sum of Seventy Thousand Dollars ($70,000) (the "Settlement Payment") as follows:

      1. Ten Thousand Dollars ($10,000) no later than June 30, 2018 (the "June Installment");

2.      Twelve Thousand Dollars ($12,000) no later than July 31, 2018;

3.      Twelve Thousand Dollars ($12,000) no later than August 31, 2018;

4.      Twelve Thousand Dollars ($12,000) no later than September 30, 2018; and

5.      Twelve Thousand Dollars ($12,000) no later than October 31, 2018.

6.      Twelve Thousand Dollars ($12,000) no later than November 30, 2017.

Separate and apart from its obligation to pay the Settlement Payment, including the June Installment, no later than June 30, 2018, ERFS shall remit to Wilder Five Thousand Dollars ($5,000) as compensation for Wilder's work on behalf of ERFS during June 2018.

b.  **Default.** In the event of a default by ERFS in the payment of any amount due under Section 1 (each payment, an "Installment"), Wilder may demand in writing that ERFS pay such Installment immediately, and (i) in the event ERFS has not paid such installment within seven (7) days of such written demand, ERFS agrees to and shall pay Wilder an additional Five Hundred Dollars ($500) as a penalty for its late payment; and (ii) in the event ERFS has not paid such installment within fifteen (15) days of such written demand, ERFS agrees that Wilder shall be entitled to judgment against ERFS in the amount of $70,000, less any payments made under this Agreement plus interest accruing at a rate of Twenty Four Percent (24%) per annum from the Effective Date. Should it become necessary for any party hereto to file legal action to enforce or interpret any term or terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees and costs.

In the event of a default by ERFS, Wilder shall send written notice (electronic communications included) to:

Environmental Remediation and Financial Services, LLC
ATTN: Mark Vigneri
2150 Highway 35, Suite 250
Sea Girt, NJ 08750
mvigneri@erfs.com

With a copy to:

Matsikoudis & Fanciullo, LLC
ATTN: Derek Fanciullo, Esq.
128 Monticello Avenue, STR 1
Jersey City, NJ 07304
dfanciullo@mf-legal.com

c. **Tax Liability.** Wilder agrees to and shall assume any and all tax obligations that may be imposed now or at any future time in connection with the Settlement Payment and/or any Installment. Wilder agrees to and shall indemnify ERFS and hold ERFS harmless against any claims, assessments, penalties, liens and/or judgments that may be asserted or levied against ERFS for liability for unpaid taxes associated with the Settlement Payment and/or any Installment. It is understood by Wilder, and Wilder acknowledges and agrees, that neither ERFS nor any of its representatives have made any representations regarding the legal or tax consequences of this Agreement. Notwithstanding any other provision of this Agreement, Wilder shall not be required to indemnify ERFS and hold ERFS harmless against any penalty imposed on ERFS by any taxing agency related to ERFS's reporting and/or payment of any tax obligations related to Wilder's compensation for the Fiscal Year 2017, *provided, however,* that, in the event any taxing agency penalizes Wilder for, *inter allia,* the inaccurate reporting or underpayment of Wilder's tax obligations for the Fiscal Year 2017, Wilder shall, within three (3) business days of his receipt of any such notice(s) of penalty, forward a copy of same to ERFS for reimbursement.

2. **Dismissal of Action.** No later than **five (5) days** after the Effective Date, Wilder shall dismiss, cause to be dismissed and/or otherwise effectuate the dismissal of the Action and any claims existing or pending in any jurisdiction naming, including or otherwise relating to ERFS, including any of its affiliates, successors, assigns, officers, directors, employees, agents, attorneys, insurers, board members and representatives (each, a "Claim"). No later than **June 27, 2018,** Wilder shall provide to ERFS (i) proof, in writing, of Wilder's mailing to the DOL the signed letter attached hereto as **Exhibit A,** and (ii) verification, in writing, from the DOL of the Action's dismissal and removal from the DOL's docket. In the event Wilder fails to dismiss the Action or otherwise effectuate its dismissal and removal from the DOL's docket, and/or fails to dismiss or effectuate the dismissal of any Claim(s), Wilder agrees to and shall defend, indemnify and hold harmless ERFS, inclusive of it successors, assigns, officers, directors, employees, agents, attorneys, insurers, board members and representatives, from the Action and any such Claim(s), and any and all resulting losses, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees and any award amount[s]) arising from the Action and/or Claim(s).

3.  **Termination of Employment with ERFS**: As of the Effective Date, Wilder shall cease and/or terminate and/or resign from any relationship with ERFS, including, but not limited to, any relationship as an employee and/or independent contractor, provided, however, that Section 6 ("Confidentiality") of the certain At Will Employment Agreement (the "Employment Contract") entered into by and between Wilder and ERFS, attached hereto as **Exhibit B**, inclusive of its various subparts, shall survive Wilder's cessure, termination and/or resignation of his relationship with ERFS.

    For purposes of clarity, the Parties acknowledge and agree: (i) Section 7 ("Noncompetition") of the Employment Contract shall *not* survive beyond the Effective Date; and, therefore, (ii) subsequent to the Effective Date, (a) Wilder shall be allowed to pursue and engage in employment with competitors of ERFS and/or solicit ERFS customers, without fear of reprisal from ERFS (so long as Wilder's actions comport with Section 6 of the Employment Contract), and (b) ERFS, inclusive of its affiliates, successors, assigns, officers, directors, employees, agents, attorneys, insurers, board members and representatives, shall not interfere with Wilder's pursuit of employment or solicitation of customers.

4.  **Time of the Essence.** The Parties acknowledge and agree that, with respect to all dates and deadlines set forth in this Agreement, time is of the essence.

5.  **Release.** Each Party agrees to fully and completely waive, release and forever discharge the other Party, including such Party's affiliates, successors, assigns, officers, directors, employees, agents, attorneys, insurers, board members and representatives, from any and all claims, actions, monies due, shares due, causes of action, complaints, grievances, demands, allegations, promises, and obligations for damages, losses, expenses, fees, attorneys' fees or costs, equity awards, equity monies, and any and all other demands the parties may have against one another arising out of or relating the other subject matter of this Agreement, whether known or unknown, suspected or concealed through the execution date of this Agreement, provided however that this release shall not release the obligations and rights stated in this Agreement. Additionally:

    (a) Each Party shall not bring or participate in any lawsuit, complaint, proceeding, grievance, class action, or action of any kind at law, in equity, or otherwise in any court of the United States or in any state, or in any administrative agency of the United States or any state, county, or municipality, or before any tribunal, public or private, against the other Party and arising from or relating to

Wilder's work with and/or relationship to ERFS and/or any other occurrence or purported fact occurring prior to the date of this Agreement.

(b) The Parties shall not overtly, anonymously, or as a whistleblower, make any direct or indirect complaints or reports to any administrative agency of the United States or any state, county, municipality, or before any other tribunal, public or private board, panel, or agency against any other Party.

(c) The Parties shall not use the allegations herein as evidence in, or the subject matter of, any future lawsuit or proceeding against any other Party, based upon any event, occurrence, or purported fact occurring prior to the date of this Agreement, except in an action instituted by any party hereto alleging a breach of this Agreement.

(d) The waiver and release and covenant not to sue are essential and material terms of this Agreement and that no settlement could have been reached by the Parties without these terms. The Parties affirm that they understand and acknowledge the significance and consequence of these specific terms.

6. **Settlement Not an Admission.** This Agreement, and any negotiations or proceedings connected with it, shall not in any event constitute or be construed as, or be deemed to be evidence of, an admission or concession of any wrongdoing by any Party hereto.

7. **Representations and Warranties.** The Parties hereby represent and warrant, as to the respective Party, that (a) as to ERFS and its affiliates, it is duly formed and organized and validly existing under the laws of the State of New Jersey, (b) each Party has the requisite power and authority to enter into this Agreement (on behalf of itself and/or herself, and, in the case of the entity signatories, their affiliates and their related individuals) and to perform the obligations undertaken by her, it, or them hereunder, (c) with respect to ERFS and its affiliates, it has taken all necessary corporate, legal and any other internal actions to approve the entering into and performance of this Agreement and no further corporate, legal or other internal approvals are necessary, (d) each Party has the ability to perform and abide by the obligations as stated in this Agreement, (e) no other person or entity has or has had any interest in the claims, demands, obligations or causes of action referred to in this Agreement, (f) the Party is under no obligation or restriction that would in any way interfere or conflict with his or its performance hereunder, and (g) the Parties have legal counsel of their own choice or had an opportunity to obtain such legal counsel to explain the legal effect of signing this Agreement.

8. **Entire Agreement.** This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and may not be modified or amended, except in a writing signed by the Parties. This Agreement is the product of negotiation between and among the Parties, and as such the identity of the drafter shall be irrelevant to the construction of this Agreement. This Agreement shall be construed as if all Parties jointly prepared it, and any uncertainty or ambiguity or incompleteness shall not be interpreted, construed or applied against any Party on the ground that such Party or her/its attorney prepared it.

9. **Confidentiality.** The terms of this Agreement, and any and all facts related to the negotiations leading thereto, are strictly confidential (the "Information"). The Parties agree not to publicize or disclose the Information, directly or indirectly, to any person or entity except as may be necessary or required by law or by valid order of a court. If any Party or person acting on behalf of a Party hereto receives an inquiry about this Agreement, such Party will respond only that "the matter has been resolved." Furthermore, the Parties and their counsel shall not post or otherwise disclose or reveal to any person or entity any Information on the Internet or any other media outlet, including but not limited to websites, newspapers, email, text, Facebook, Instagram, LinkedIn, Twitter or any other social media web site or platform, whether electronic, digital or physical. Nothing in this Agreement shall, however, be deemed to interfere with each Party's obligation to report transactions with appropriate governmental, taxing and/or registering agencies.

10. **Non-Disparagement.** Wilder shall not disparage ERFS, or any of its affiliates, directors, officers, or agents, or otherwise take any action which could reasonably be expected to adversely affect the professional or personal reputation of the ERFS or any of its affiliates, directors, officers, agents or employees. ERFS shall not disparage Wilder, or any of his heirs, representatives, successors, insurers and assigns, or otherwise take any action which could reasonably be expected to adversely affect the professional or personal reputation of Wilder or any of his heirs, representatives, successors, insurers and assigns.

11. **Validity of Agreement.** Should any clause, sentence, paragraph or other part of this Agreement be finally adjudged by any court of competent jurisdiction to be unconstitutional, invalid or in any way unenforceable, such adjudication shall not affect, impair, invalidate or nullify the remainder of the Agreement, but shall affect only the clause, sentence, paragraph or other parts so adjudged.

12. **Execution in Counterparts.** This Agreement may be executed in Counterparts, each of which shall be deemed an original, but all of which together constitute one and the same Agreement.

13.  **Costs and Fees.** Each Party agrees to bear the expense of her or its own attorney's fees and costs in connection with the subject matter and/or potential claims asserted in this Agreement and the other matters addressed herein.

14.  **Governing Law and Forum.** This Agreement shall be interpreted, governed and enforced according to the internal laws of the State of New Jersey, without reference to its conflicts of laws principles. Any disputes arising out of, or relating to, this Agreement shall only be brought in the United States District Court for the District of New Jersey (the "Court"), with all Parties submitting to personal jurisdiction of that Court. Each Party irrevocably waives (any) objection that it now has or hereafter may have to the laying of venue of any suit, action or proceeding based on this Agreement and further irrevocably waives any claim that any such suit, action or proceeding based on this Agreement has been brought in an inconvenient forum.

"any"
(DW) 6-27-2018

15.  **Binding On Successors.** The provisions of this Agreement shall be binding upon and shall inure to the benefit of the successors, assigns, heirs, executors, and administrators of the respective Parties.

16.  **Waiver of Breach.** No waiver by a Party hereto of a breach of any provision of this Agreement by the other Party, or of compliance with any condition or provision of this Agreement to be performed by such other Party, will operate or be construed as a waiver of any subsequent breach by such other Party or any similar or dissimilar provisions and conditions at the same or any prior or subsequent time. The failure of any Party to take action by reason of such breach shall and will not deprive such Party of the right to take action at any time while such breach continues. To the extent that any Party to this Agreement materially breaches any provision of this Agreement, such breach or failure shall not affect the validity of this Agreement.

17.  **Definitions, Headings and Numbers.** A term defined in any part of this Agreement shall have the defined meaning wherever such term is used herein. The headings contained in this Agreement are for reference purposes only and shall not affect in any manner the meaning or interpretation of this Agreement. Where appropriate to the context of this Agreement, use of the singular shall be deemed also to refer to the plural, and use of the plural to the singular.

18.  **Amendments and Termination.** This Agreement may not be amended or terminated except by a writing executed by all parties hereto.

19. **Communications.** All notices and other communications given or made pursuant to and/or in connection with this Agreement shall be in writing, and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the Party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next-business-day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at the following addresses or email addresses, or such other addresses or email addresses as are subsequently specified by the recipient Party in a written notice given in accordance with this Section 19:

| | |
|---|---|
| If to ERFS/Vigneri: | Environmental Remediation and Financial Services, LLC<br>ATTN: Mark Vigneri<br>2150 Highway 35, Suite 250<br>Sea Girt, NJ 08750<br>mvigneri@erfs.com |
| With a Copy to: | Matsikoudis & Fanciullo, LLC<br>128 Monticello Avenue, STR 1<br>Jersey City, NJ 07304<br>dfanciullo@mf-legal.com |
| If to Wilder: | David Wilder<br>307 Stonebrook Drive<br>Clayton, North Carolina 27520 |

[SIGNATURE PAGE(S) TO FOLLOW]

**IN WITNESS WHEREOF**, the Parties hereto evidence their agreement and have executed this Agreement as of the day and year first below written.

**Environmental Remediation and Financial Services, LLC:**

By: _Mark Vigni_

Name: _MARK VIGNERI_

Title: _PRESIDENT & CEO_

Date: _JUNE 27, 2018_

**Mark Vigneri:**

By: _Md Vign_

Name: _MARK VIGNERI_

Date: _JUNE 27, 2018_

**David Wilder:**

By: _David Wilder_

Name: _David Wilder_

Date: _June 27, 2018_

## EXHIBIT B

The remaining defendants hereby consent to the filing of this Notice of Removal:

**CHRISTOPHER J. STANCHINA, ESQUIRE, LLC**

By:   */s/ Christopher J. Stanchina*
Christopher J. Stanchina, Esq.
222 New Road, Suite 206
Linwood, New Jersey  08221
(609) 927-0200
chris@stanchinalaw.com
*Attorney for Defendant*
*Michael Warner*

Dated:  March 12, 2019

**THE LAW OFFICE OF BRIAN D. HEUN**

By:   */s/ Brian D. Heun*
Brian D. Heun, Esq.
P.O. Box 299
Linwood, NJ 08221
(609) 380-4485
brian@heunlawoffice.com
*Attorney for Defendant*
*David Wilder*

Dated:  March 12, 2019

**VON BRIESEN & ROPER, S.C.**

By:   *Rhyan J. Lindley*
Rhyan J. Lindley, Esq.
10 East Doty Street
Suite 900
Madison, WI 53703
(608) 310-3606
rlindley@vonbriesen.com
*Attorney for Defendant*
*Janesville Dredging Company LLC*

Dated:  March 12, 2019